UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| SEABURY & SMITH, INC.,<br>a Delaware corporation,<br><br>    Plaintiff,<br><br>    vs.<br><br>PAYNE FINANCIAL GROUP, INC.,<br>a Montana corporation, EDWARD<br>EUGENIO, and D. GERARD BULGER,<br><br>    Defendants. | NO. CV-03-481-JLQ<br><br>MEMORANDUM OPINION AND<br>ORDER **GRANTING IN PART AND<br>DENYING IN PART** PLAINTIFF'S<br>MOTION FOR PARTIAL SUMMARY<br>JUDGMENT |

   BEFORE THE COURT is Plaintiff's Motion for Partial Summary Judgment (Ct. Rec. 30). Plaintiff is represented by **Leslie R. Weatherhead** and **Kimberly A. Kamel**. Defendants are represented by **James B. King** and **Christopher Kerley**. Plaintiff Seabury & Smith ("Seabury") alleges that Defendants Edward Eugenio and Gerard Bulger left their employment with Seabury, commenced employment with Payne Financial Group ("Payne") and thereafter solicited and serviced former Seabury clients in violation of their restrictive covenant agreement with Seabury. Seabury alleges that Payne engaged in a "team effort" with Eugenio and Bulger to tortiously interfere with the business relationship of 25 long-time Seabury clients. Seabury seeks summary judgment as to liability on two of the five claims in its Second Amended Complaint (Ct. Rec. 25). Seabury seeks a ruling that Defendants Eugenio and Bulger breached their covenants not to compete and that all Defendants tortiously interfered with business expectancy.

   Defendants counter that the covenant is ambiguous. Defendants claim they were aware of the covenant and attempted to abide by it, but that it was ambiguous in its

ORDER - 1

failure to define key terms and overbroad to the extent it prohibited social contacts.

## BACKGROUND

As Plaintiff is the party moving for summary judgment, the evidence and inferences therefrom are viewed in the light most favorable to Defendants. The facts are undisputed except where otherwise stated.

Seabury is part of Marsh & McClellan Companies and provides insurance, investment, and consulting services in Spokane, Washington. Seabury requires its employees to sign a restrictive convenant agreement which provides that they will not solicit or service Seabury customers for a period of time after leaving Seabury. (Pltf St of Fact ¶ 14). William Wrigglesworth worked for Seabury for 25 years(when Seabury was formerly known as Sedgwick James) and after the name changed to Seabury. (Id. at ¶ 18 & 19). While at Seabury, Mr. Wrigglesworth was a manager and had oversight over Gerard Bulger, Scott McGann, and Edward Eugenio. (Id. at ¶ 21). Mr. Wrigglesworth left Seabury in July 2000 and as part of his severance package signed a two-year non-compete agreement which extended through June 30, 2002.

Mr. Wrigglesworth moved to Montana and went to work for Terry Payne & Company. (Deft. St. Fact ¶ 221). Terry Payne & Company became Payne Financial Group in January 2001 and Mr. Wrigglesworth became President and CEO. (Id. at ¶ 220-221). Mr. Wrigglesworth moved back to Spokane in the summer of 2002 to open a Spokane office for Payne Financial Group. (Id. at ¶ 228).

Defendant Bulger had worked in the insurance industry for 15 years when he left Seabury on August 15, 2003, and commenced employment with Payne. (Deft. St. Fact ¶ 1 & 2). Mr. Bulger signed a non-compete agreement while at Seabury. (Id. at ¶ 6). The applicable term of the restrictive covenant agreement was August 31, 2003 through August 30, 2004. (Pltf. St. of Fact ¶ 94). As an employee of Payne, Mr. Bulger dropped off policies to Bonner General (formerly a client of Seabury and former account of Bulger's). (Deft. St. of Fact ¶ 17). Mr. Bulger attended a meeting with Spokane Mental Health (a former Seabury client) at which Spokane Mental Health signed a broker of

ORDER - 2

record letter with Payne. (Id. at ¶ 25-26). Mr. Bulger similarly attended meetings with several other former Seabury clients including: ALSC Architects, Fruci & Associates, and National General Supply.

    Mr. Scott McGann began working for Seabury in 1993, when it was Sedgwick James. (Deft. St. Fact ¶ 147). While McGann is not a Defendant, his actions as an agent of Payne are relevant as to the claims against Payne. He left Seabury during the summer of 2002. (Id. at ¶ 148). While at Seabury, McGann signed the same restrictive covenant agreement as Defendants Bulger and Eugenio. The agreement was in effect for 12 months after he left Seabury. (Pltf's Ex. 1). McGann accepted a position with Payne in September, 2002. (Pltf. St. Fact ¶ 38). McGann does admit that some of his former clients at Seabury switched their business to Payne during the period of his non-compete. (Deft. St. Fact ¶ 154). McGann attended a meeting with former client Metriguard during the period of his non-compete agreement. (Id. at ¶ 155). McGann also attended a meeting with former client Tri-State Distributors. (Id. at ¶ 158). McGann arranged an inspection of former client YMCA's premises and accompanied an insurance carrier representative on the inspection. (Id. at ¶ 183). McGann admits talking to a current Seabury employee, Brady Cass, about leaving Seabury and informed Cass that he could talk to Mr. Wrigglesworth if he was interested in Payne. (Id. at ¶ 196). This was allegedly in violation of McGann's restrictive covenant agreement.

    Defendant Eugenio began working for Sedgwick James in 1997. Eugenio resigned from Seabury on November 27, 2002 and accepted a position at Payne. (Pltf's St. Fact ¶ 76). While at Seabury, Eugenio signed a restrictive covenant agreement. (Pltf's Ex. 1). The covenant was effective for one-year after his resignation from Seabury, from November 27, 2002 to November 26, 2003. (Pltf St. of Fact ¶ 77). Eugenio admits visiting a former-Seabury client, American Van Service, during the period of the non-competition agreement. (Deft. St. Fact ¶ 111). Eugenio also admits talking to three Seabury employees--Beth Scott, Jeff Hanson, and Paul Belles about job opportunities and differences between working at Seabury and Payne. (Id. at ¶ 134-

ORDER - 3

136). Eugenio additionally states that he handled personal lines coverage for some former clients; filed broker of record letters for two former Seabury clients whom Mr. Neupert, a vice-president at Seabury, had allegedly told him he could take; and may have dropped off a policy to a former client. (see Eugenio declaration, Ct. Rec. 49).

## SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994). The moving party is entitled to summary judgment when, viewing the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). While the moving party does not have to disprove matters on which the opponent will bear the burden of proof at trial, they nonetheless bear the burden of producing evidence that negates an essential element of the opposing party's claim and the ultimate burden of persuading the court that no genuine issue of material fact exists. *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party has carried its burden, the opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1975). Rather, the opposing party must come forward with specific facts showing that there is a genuine issue for trial. *Id*.

## DISCUSSION

### I. Breach of Restrictive Covenant Claims

Scott McGann, Edward Eugenio, and Gerard Bulger all signed agreements with Seabury that included a covenant not to compete or interfere. Specifically, the agreements provided:

"<u>COVENANTS NOT TO COMPETE OR INTERFERE</u>. While employed by Seabury & Smith, and for a period ending twelve (12) months from and after the

ORDER - 4

termination of such employment, Employee will not, directly or indirectly, as a sole proprietor, member of a partnership or stockholder, investor, officer or director of a corporation, or an employee, agent, associate or consultant of any person, firm or corporation, other than for the exclusive benefit of Seabury & Smith:

    (a) solicit or accept business of the type offered by Seabury & Smith during the term of Employee's employment by Seabury & Smith from, or perform or supervise the performance of any services related to such business for:

        (i) any clients or prospects of Seabury & Smith or its affiliates who were solicited or serviced, directly or indirectly, by Employee, or by those supervised, directly or indirectly, by Employee in whole or in part; or

        (ii) any former client of Seabury & Smith or its affiliates who was such within two years prior to termination of Employee's employment with Seabury & Smith and who was solicited or serviced, directly or indirectly, by Employee, or by those supervised, directly or indirectly, by Employee in whole or in part; or

    (b) directly or indirectly solicit or assist others in soliciting any employee of Seabury & Smith or its affiliates to terminate his or her employment with Seabury & Smith."

The agreement further provided restrictions on the disclosure of confidential information:

    "<u>DISCLOSURE OF INFORMATION</u>:  Employee recognizes and acknowledges that Seabury & Smith's trade secrets and confidential or proprietary information (such as but not limited to information relating to Seabury & Smith's operations, services, service providers, products, computer codes, clients, prospects, etc.), including such trade secrets or information as may exist from time to time, are valuable, special and unique assets of Seabury & Smith's business and access to and knowledge of which are essential to the performance of Employee's obligations to Seabury & Smith.  Employee will not, during or after the term of employment by Seabury & Smith, in whole or in

ORDER - 5

part, disclose such secrets or confidential or proprietary information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, nor during such period shall Employee make use of any such property for Employee's own purposes or for the benefit of any person, firm, corporation or other entity (except Seabury & Smith) under any circumstances, except that after such term of employment these restrictions shall not apply to such secrets or information which are then in the public domain, provided that Employee was not responsible, directly or indirectly, for such secrets or information entering the public domain without Seabury & Smith's consent."

Generally, restrictive covenants in employment contracts are enforceable so long as the restrictions therein are "not greater than are reasonably necessary to protect the business or good will of the employer, even though they restrain the employee of his liberty to engage in a certain occupation or business, and deprive the public of the services, or restrain trade." *Alexander & Alexander v. Wohlman*, 19 Wash.App. 670, 686 (1978)(citing *Racine v. Bender*, 141 Wash. 606 (1927)).  In examining reasonableness, the court will look to the extent of the restriction, the length of time the restriction is in effect, and the geographic area covered.  The reasonableness of the covenant is a conclusion of law. *Alexander* at 684.  The court in *Racine* employed a three-part test to determine if: 1) the restraint is necessary for the protection of the business or good will of the employer; 2) the restraint on the employee is greater than is reasonably necessary; and 3) the degree of injury to the public from the loss of the service and skill of the employee is great enough to warrant nonenforcement of the covenant. *Id.* at 686.

Defendants' primary challenge to the restrictive covenant in the agreements they signed, is not that the agreements were unreasonable in geographic area or term, but that the covenants contained ambiguous terms and Plaintiff's broad construction of the terms, if accepted, would make the covenants unreasonable.  Defendants complain that the terms "directly or indirectly" and "solicit" and "service" are ambiguous.  Words

ORDER - 6

used in a contract must be given their plain and ordinary meaning, unless the contract states otherwise. A contract should be read as an average person would read it and the terms should be given a practical and reasonable interpretation. *Eurick v. Pemco Ins. Co.*, 108 Wash.2d 338 (1987). "If only one reasonable meaning can be ascribed to the agreement when viewed in context, that meaning necessarily reflects the parties' intent." *Martinez v. Miller Indus.*, 94 Wash.App. 935 (1999). Whether a contract is ambiguous is a question of law. *R.A. Hanson, Co. v. Aetna Ins. Co.*, 26 Wash.App.290 (1980). A contract term is ambiguous if uncertain or when capable of two or more reasonable and fair interpretations. *Allstate Ins. Co. v. Hammonds*, 72 Wash.App. 664 (1994). Only when there is a bona fide ambiguity may extrinsic evidence be presented to the trier of fact for interpretation.

Defendants argued at oral argument that this court could not determine the reasonableness, enforceability, and ambiguity of the restrictive covenants. As the cases cited *supra* demonstrate, the rules of law are to the contrary. See also *Pacific Aerospace & Electronics, Inc. v. Taylor*, 295 F.Supp.2d 1205 (E.D. Wash. 2003)(finding as a matter of law that the non-solicitation provision of the restrictive covenant was reasonable and not an undue restraint of trade). The terms "solicit", "service" and "direct or indirect" are not ambiguous. It is well-settled law in the state of Washington that a restrictive covenant may prohibit the performance or providing of services and solicitation.

In *Racine v. Bender*, 141 Wash. 606 (1927), almost eighty years ago the Washington Supreme Court upheld a covenant which stated that an employee, after leaving employment, shall not "solicit" or "perform any accounting or auditing work". The Washington Supreme Court construed this covenant as being written "in words that no man may misunderstand". *Id.* at 609. In *Perry v. Moran*, 109 Wash.2d 691 (1987), the Washington Supreme Court again upheld a restrictive covenant which stated that the employee shall not "provide services". The court specifically rejected an argument that the employer could adequately protect its client base by merely prohibiting the former

employee from soliciting or diverting clients.  The court found that such a prohibition would not be an adequate safeguard, stating: "It is reasonable for the employer to preclude the employee from servicing those who were clients of the employer during the period of employment and for a period after the cessation of employment." *Id.* at 701.  This court rejects the Defendants' argument that the words "directly or indirectly" rendered the covenant ambiguous.  These words have a commonsense and ordinarily applied meaning.  See *Pacific Aerospace & Electronics, Inc. v. Taylor*, cited *supra* (upholding a covenant as reasonable and enforceable, as a matter of law, that prohibited direct or indirect solicitation).

The court finds as a matter of law that the covenant is not ambiguous.  The court further finds that the covenant is reasonable and enforceable as a matter of law.  The covenant is limited in duration to the relatively short time period of one-year. Washington courts have routinely upheld similar covenants longer in duration. See *Racine v. Bender*, 141 Wash. 606, 615 (1927)(upholding a 3-year restriction on soliciting or performing services for former clients and noting that "the limitation, it will be seen, is far less restrictive than many upheld by the courts").  The covenant is also reasonably limited in scope to Plaintiff's clients and prospective clients who were solicited or serviced during employee's term of service with Plaintiff.

This court additionally finds that disputed factual issues remain as to whether Defendants Eugenio and Bulger breached their restrictive covenants.  Eugenio and Bulger have both filed affidavits claiming that they did not solict or service former Seabury clients during the period of non-compete restrictions.  Seabury claims that Defendants Eugenio and Bulger  breached the covenant and correspondingly tortiously interfered with upwards of 25 Seabury clients.

Defendants do admit to attending meetings with former clients (but not actively participating), to performing errands such as dropping off a policy, and to receiving (but then redirecting) an occasional call from a former client.  However, Defendants dispute that any of these activities constitute the servicing or solicitation prohibited by the

ORDER - 8

covenant. Defendant Bulger does admit accepting the business of former clients Athletic Foundation and LLC & M during the period of his non-competition agreement. The trier of fact could find this to be in violation of the covenant and could find breach as to these two clients. However, Bulger also asserts that the transfer of this account was negotiated with Seabury, was not immediately rewritten upon transfer, and that Payne offered to provide Seabury with commission for the renewal. Seabury contends that Defendants' actions in accepting this account violated the terms of the covenant. Numerous factual issues remain to be submitted to the trier of fact as to the majority of the former Seabury clients. The court declines to find, as a matter of law, that Defendants have breached the covenant.

## II.  Tortious Interference with Business Expectancy

Under Washington law, there are five elements to the tort of interference with a business expectancy. A plaintiff must establish: 1) the existence of a valid contractual relationship or business expectancy; 2) that the defendant(s) had knowledge of the expectancy; 3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; 4) that the defendant interfered for an improper purpose or used improper means; and 5) resulting damage. *Newton Ins. Agency v. Caledonian Ins. Group*, 114 Wash.App. 151, 157-58 (2002)(citing *Leingang v. Pierce County Med. Burequ*, 131 Wash.2d 133 (1997)).

As to the first element, a valid business expectancy "includes any prospective contractual or business relationship that would be of pecuniary value". *Newton Ins.* at 158. It is undisputed that Seabury had clients, had on-going contracts with those clients, and that many of the 25 clients which were allegedly interfered with had been clients of Seabury for several years. The first element is established.

As to the second element, Defendants Eugenio and Bulger undisputedly had knowledge of Seabury's clients and business expectancy. Payne additionally had knowledge of the covenants not to compete relevant to Eugenio, Bulger, and McGann. Interference with a business expectancy is intentional if "the actor desires to bring about

ORDER - 9

or if he knows that the interference is certain or substantially certain to occur as a result of his action." *Id.* at 158.  In *Newton*, all that was required to establish this element was that the former employees [Eugenio & Bulger] and new employer [Payne] intended that the former employer's [Seabury's] customers would switch from [Seabury] to [Payne]. It is undisputed that Payne desired to, and in fact did, obtain former Seabury customers. Thus the first three elements are established.

Payne disputes that it interfered for an improper purpose or improper means and it disputes that Seabury can prove the causal connection to damages.  Payne argues that Seabury cannot establish that its clients would not have left absent any 'interference' from Payne.  Seabury argues that the employees' breach of their restrictive covenants and Payne's capitalization of such breach establishes the fourth prong of interference by improper means.  Payne argues that it engaged in legitimate competition for clients and that Seabury has the burden of proving Payne acted in bad faith or dishonestly.  These are disputes of fact as to the fourth and fifth elements.

The *Newton Ins*. court held that the fourth element is established, as a matter of law, when interference with a business expectancy is in violation of a contract not to compete.  Plaintiff cannot establish its right to summary judgment on the tortious interference claim without first establishing that Defendants breached the restrictive covenants.  Therefore, Plaintiff's motion for summary judgment on the tortious interference claim is denied.

**IT IS HEREBY ORDERED:**

1. Plaintiff's Motion for Partial Summary Judgment (Ct. Rec. 30) is **GRANTED in part and DENIED in part as set forth herein**.  The court holds as a matter of law that the non-compete covenants at issue are reasonable, enforceable, and unambiguous. The court finds that genuine issues of material fact remain as to whether Defendants breached their respective covenants.

The court additionally holds, as a matter of law, that Plaintiff has established the first three elements of tortious interference.  However, as the court has not found breach

ORDER - 10

1  of the covenant as a matter of law, the court cannot find that Defendants tortiously
2  interfered as a matter of law.
3      2.  Defendants' numerous motions to strike the Plaintiff's affidavits and briefing
4  in support of Plaintiff's motion for partial summary judgment are hereby **DENIED.** (Ct.
5  Rec. 46, 48, 72, & 74).
6      **IT IS SO ORDERED**.  The Clerk is hereby directed to enter this Order and
7  furnish copies to counsel.
8      **DATED** this _____ day of July, 2005.

                    JUSTIN L. QUACKENBUSH
                SENIOR UNITED STATES DISTRICT JUDGE